Washington County, Petitioner-Appellant,

v.

Wisconsin Employment Relations Commission,
Respondent-Respondent,

Service Employees International Union Local 150,
Interested Party-Respondent.

Court of Appeals

*No. 2010AP582. Oral Argument December 8, 2010.
—Decided March 9, 2011.*

2011 WI App 49

(Also reported in 797 N.W.2d 902.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Nancy L. Pirkey* and *Joel S. Aziere* of *Buelow, Vetter, Olson, Buikema & Vliet, LLC,* Waukesha.

On behalf of the respondent-respondent, the cause was submitted on the brief of *David C. Rice,* assistant attorney general, and *J.B. Van Hollen,* attorney general.

On behalf of the interested party-respondent, the cause was submitted on the brief of *Marianne Goldstein Robbins* and *Sara J. Geenen* of *Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.,* Milwaukee.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. REILLY, J.   Since 1974 the collective bargaining agreements between Washington County and the Service Employees International Union Local 150 have given the County the right to lay off employees or contract out for goods and services. The issue in this appeal is whether the County had a unilateral duty during negotiations over the 2007–08 collective bargaining agreement to disclose to the Union that the County was seriously considering privatizing its laundry and housekeeping services in the near future. The Union argues that the County negotiated in bad faith by not notifying it that the County was contemplating

412

subcontracting during the term of the 2007–08 collective bargaining agreement. The County claims that it had no such duty. The Wisconsin Employment Relations Commission (WERC) ruled that the County did have a duty and that the County negotiated in bad faith. The circuit court affirmed. We hold that as there is nothing in the record to indicate that the Union brought up the issue of subcontracting during negotiations, the County did not have a duty to disclose its intention to subcontract.

## FACTS

¶ 2.   Washington County has long owned and operated a nursing home facility called Samaritan Health Center. Many of the employees at Samaritan are represented by the Union. The Union and the County have negotiated the terms of collective bargaining agreements since 1974.[1] The collective bargaining agreements, including the 2007–08 agreement at issue, have always included the contractual right of the County to lay off employees and the right to contract out for goods or services. Specifically, the "management rights" article states that "[t]he County retains and reserves the sole right to . . . layoff employees [and] to contract out for goods or services."

¶ 3.   In 2006, Samaritan was operating at a loss exceeding $600,000. To reduce costs, the County initially issued layoff notices to five Union members. Notice of the layoffs was also given to the Union in October 2006

[1] The only collective bargaining agreement in the record is for the period from 1/1/07–12/31/08. Based upon the record and oral argument, it appears that the contractual provisions at issue in this case have remained constant since at least 1974. It is unclear whether the County and the Union had any collective bargaining agreements prior to 1974.

413

during a bargaining session over the 2007–08 collective bargaining agreement. The Union responded by filing a grievance alleging that the proposed layoffs violated seniority status procedures and were done to avoid paying benefits. The County rescinded the layoffs in November 2006 and notified the affected Union employees that the County would look to "other avenues to achieve operational savings in 2007. Rescinding your layoff is not a guarantee of future employment."

¶ 4.   The collective bargaining agreement provides that five months prior to the expiration of an agreement the Union is to give written notice to the County if the Union wishes to negotiate changes to the existing agreement. The record reflects that the Union did not give written notice, at any time, of any intent to change the existing agreement. On December 18, 2006, the County and the Union reached a tentative agreement to extend the collective bargaining agreement through 2007–08. The agreement was formally ratified by the County and the Union in early January 2007. The 2007–08 collective bargaining agreement continued to grant the County the right to lay off employees and to contract out for goods or services. The Union and the County agreed that the collective bargaining agreement for 2007–08 was the "complete agreement" between them, and that

> [t]he parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed from the area of collective bargaining; and that the understandings and agreements arrived at by the parties, after the exercise of that right and opportunity, are fully set forth in this Agreement. Each party, therefore, waives the right to further bargaining on any subject or matter not specifically referred to or covered

in this Agreement, regardless if either the subject or matter was known or contemplated by the parties at the time this Agreement was negotiated.

¶ 5. Prior to ratifying the 2007–08 collective bargaining agreement, the County internally met and discussed the issue of subcontracting laundry and housekeeping services to determine whether there would be cost savings. On April 4, 2007, the County authorized a formal request for a proposal to subcontract Samaritan's laundry and housekeeping services. The Union filed a grievance on May 18, 2007, alleging that the County's proposed subcontracting violated the collective bargaining agreement. The County proceeded ahead and on June 7, 2007, subcontracted its housekeeping, custodial, and laundry services to a private vendor, saving the County $234,165. The County mailed layoff notices to eighteen affected Union members. The Union responded by filing a complaint with WERC, alleging that the County committed prohibited labor practices by failing to negotiate with the Union over the proposed subcontracting in violation of WIS. STAT. § 111.70(3)(a)1, 4 and 5 (2009–10)[2] of the Municipal Employee Relations Act (MERA).

¶ 6. Two disputes were before WERC: the Union's grievance alleging that the County breached the 2007–08 collective bargaining agreement and the Union's prohibited practices complaint alleging that the County violated WIS. STAT. § 111.70(3)(a)1, 4, and 5 by unilaterally subcontracting the laundry and housekeeping operations at Samaritan. The grievance was a matter for arbitration through WERC per the collective bargaining agreement, whereas the prohibited prac-

---

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

tices complaint was a matter for decision by declaratory ruling of WERC per § 111.70(4)(b). The parties agreed that Richard McLaughlin, a member of the WERC staff, would serve as the arbitrator on the grievance matter. WERC subsequently appointed McLaughlin as the hearing examiner in the prohibited practices complaint.

¶ 7. Following an evidentiary hearing, McLaughlin denied the Union's grievance after he concluded that the collective bargaining agreement gave the County the power to subcontract and that the County's decision to subcontract was based solely on a desire to reduce labor costs. The Union produced no evidence that the County acted out of hostility towards the Union. Because the Union did not appeal McLaughlin's denial of the Union's grievance, that issue is not before this court.

¶ 8. In his capacity as the hearing examiner, McLaughlin also dismissed the Union's prohibited practices complaint. McLaughlin first concluded that the County did not violate its duty to bargain because the collective bargaining agreement clearly addressed the issue of subcontracting such that each party was entitled to rely on the bargain that it struck. Second, McLaughlin concluded that it was not bad faith when the County failed to inform the Union during negotiations that the County was considering subcontracting.

¶ 9. The Union appealed McLaughlin's dismissal of the prohibited practices complaint to WERC pursuant to WIS. STAT. § 111.07(5). Upon review, WERC modified McLaughlin's findings of fact to reflect that the County did not inform the Union during negotiation over the 2007–08 collective bargaining agreement that the County was "seriously" considering subcontracting. *Washington County,* No. 32185–B at 2 (WERC Jan. 20, 2009). Based upon this modification of fact, WERC concluded that the County failed to bargain in

good faith in violation of WIS. STAT. § 111.70(3)(a)4, as the County had a duty to disclose that it was "seriously" considering subcontracting as a way to reduce operating costs. *Washington County* at 14. WERC also noted that it was limiting its holding to the facts of the case: "We are not establishing a *per se* rule regarding a duty to disclose any and all actions that either party is seriously considering taking during the term of a contract then under negotiation." *Id.* at 17.

¶ 10.   The County appealed WERC's decision to the circuit court pursuant to WIS. STAT. § 227.52. The circuit court affirmed WERC's decision that the County had a duty to disclose to the Union that the County was considering subcontracting. The County appeals.

## STANDARD OF REVIEW

¶ 11.   We review the decision of WERC, not the circuit court. *See Milwaukee Symphony Orchestra, Inc. v. DOR*, 2010 WI 33, ¶ 30, 324 Wis. 2d 68, 781 N.W.2d 674. An administrative agency's findings of fact are reviewed using the "substantial evidence" standard. *Id.*, ¶ 31. We will only set aside WERC's findings of fact if we determine that they were unreasonable. *See id.* We accept WERC's finding of fact that the County did not inform the union during negotiations over the 2007–08 collective bargaining agreement that the County was seriously considering subcontracting.

¶ 12.   In contrast to a finding of fact, an agency's interpretation of a statute is subject to one of three levels of deference. *Id.*, ¶¶ 32, 34. The most deferential standard is "great weight" deference. This standard applies when:   (1) the agency is charged by the legis-

417

lature with administering the statute in question; (2) the agency's interpretation is long standing; (3) the agency employed its specialized knowledge or expertise in interpreting the statute; *and* (4) the agency's interpretation will provide uniformity and consistency in the application of the statute. *Id.*, ¶ 35. Under great weight deference, an agency's interpretation of a statute will be sustained even if a court finds another interpretation to be equally or more reasonable. *Id.*

¶ 13. Below great weight deference is "due weight" deference. *Id.*, ¶ 36. This standard applies when the legislature gives the agency the authority to interpret the statute and the agency has experience in the area, but the agency is not in a better position to interpret the statute than the reviewing court. *Id.* When applying due weight deference, a court will sustain an agency's interpretation if it is not contrary to the clear meaning of the statute—unless the court determines that a more reasonable interpretation exists. *Id.*

¶ 14. Finally, a reviewing court owes no deference to an agency's decision when *any* of the following conditions are met: (1) the issue presents a matter of first impression; (2) the agency has no experience or expertise relevant to the legal issue presented; or (3) the agency's position on the issue has been so inconsistent that it provides no real guidance to the reviewing court. *Id.*, ¶ 37.

¶ 15. In *City of Marshfield*, No. 28973–B (WERC Mar. 23, 1998), WERC faced a fact pattern similar to this case. There, the union alleged that the City of Marshfield engaged in bad faith bargaining by not informing the union that a wage increase would result

in layoffs. *Id.* at 5. The union argued that because it had no knowledge that a wage increase would lead to layoffs, it was the City's duty to provide that information. *Id.* at 6. The City responded that the union easily could have asked about the implications of a wage increase. *Id.* WERC ruled that the City did not negotiate in bad faith because the union "knew or should have known enough to ask the layoff question." *Id.* at 8. WERC based this conclusion on testimony that indicated that a union representative was aware of the relationship between wage increases and layoffs from conversations he had with a union member in a different City unit. *Id.* WERC did not delineate a bright-line rule for when a municipality has a duty to disclose, and cautioned:

> Where a union has no reason to know that it should ask for certain relevant and reasonably necessary information, there may be circumstances in which the employer's failure to provide said information violates the duty to bargain in good faith. In such circumstances, a union's failure to ask for the information is not a valid defense.

*Id.* WERC concluded that the City of Marshfield did not negotiate in bad faith because the union had notice and the opportunity to ask for the pertinent information and did not. *Id.*

¶ 16.   WERC has also noted:

> Intertwined with the duty to bargain in good faith is a duty on the part of an employer to supply a labor organization representing employees, *upon request,* with sufficient information to enable the labor organization to understand and intelligently discuss issues raised in collective bargaining .... Information requested by a labor organization must be relevant and reasonably necessary to its dealings in its capacity as the representative of the employees.

419

*Mayville Sch. Dist.*, No. 25144–D at 26 (WERC May 5, 1992) (emphasis added).

■■ ■■

¶ 17.   The bargaining principles extracted from these WERC cases are that when a union requests information that is relevant and reasonably necessary to the bargaining process, the municipality must furnish that information, but the municipality has no duty to provide information that the union does not request. WERC ruled in *City of Marshfield* that the City did not have a duty to disclose to the union the relationship between wage increases and layoffs because a union representative was already aware of this relationship in another unit, so the union should have known to ask for the information. *City of Marshfield*, No. 28973–B at 8. Similarly, the Union in this case was aware that Washington County was considering cost-saving measures as the County informed the Union during a negotiating session that the County was laying off five Union employees. As WERC did not cite to *City of Marshfield*, it is unknown if WERC was aware of this decision when it ruled that Washington County had a duty to disclose that it was "seriously" considering subcontracting, even though the Union never requested this information and even though the Union was put on notice that the County was exploring cost-saving measures. As *City of Marshfield* conflicts with WERC's decision in this case, we hold that WERC's position on this issue has been inconsistent and provides no real guidance to this court. We therefore apply de novo review.

## DISCUSSION

¶ 18.   WISCONSIN STAT. § 111.70(1)(a) of MERA imposes an obligation upon municipalities and labor unions to collectively bargain in "good faith." There is

no specific definition of what it means to bargain in "good faith," and the Wisconsin Supreme Court has said that the "[e]xistence or nonexistence of good faith . . . involve[s] only inquiry as to fact." *St. Francis Hosp. v. WERB*, 81 Wis. 2d 308, 311, 98 N.W.2d 909 (1959). The supreme court has also stated that MERA imposes a duty upon municipalities to collectively bargain with labor unions over the issue of subcontracting. *See Unified School Dist. No. 1 of Racine County v. WERC*, 81 Wis. 2d 89, 103, 259 N.W.2d 724 (1977). WERC has previously described the "fundamental principles of collective bargaining" under MERA:

> When parties bargain a contract, they agree that for the duration of that contract their rights and privileges are established by the terms of that agreement. Thus, it is well settled that during the term of a contract, neither party has the obligation to bargain with the other over matters addressed by that contract. Inevitably, opportunities or circumstances may arise during the term of a contract which can cause either party to regret the terms of the agreement into which they have entered. However, that regret does not provide a valid basis for compelling the other party to reopen the terms of a contract. *Instead, it is commonly understood by all parties that when bargaining a contract, they must try to anticipate potential opportunities and changed circumstances which arise during the term of their contract and then to seek contract provisions which may allow them to take advantage of these opportunities or changed circumstances.*

*Village of Saukville*, No. 28032–B at 22 (WERC Mar. 22, 1996) (italics added).

¶ 19. The language of the 2007–08 collective bargaining agreement clearly gave the County the right to subcontract. Specifically, the "management rights" article states that "[t]he County retains and reserves the

sole right to . . . lay off employees [and] to contract out for goods or services." The Union had the right to ask the County during negotiations whether any changed circumstances might arise during the term of their next agreement. Had the Union done this, it could have sought to change the existing subcontracting language, but the record indicates that the Union never brought up the issue of subcontracting during negotiations. If in fact the Union did raise the issue during negotiations, it had a duty to provide WERC with this evidence. Because the Union provided no evidence that it raised the issue of subcontracting during negotiations, the Union's silence indicates that it assented to the subcontracting language.

¶ 20.   We note that the Union knew the County was exploring cost-saving measures as the County notified the Union during a negotiating session that the County was laying off five Union members. The County's decision to subcontract therefore should not have come as a surprise to the Union. The Union had notice and an opportunity to voice its concerns at the bargaining table and it did not.

¶ 21.   This court previously held that there is no violation of the duty to bargain under MERA when a party exercises a contractual right that is already covered by a collective bargaining agreement. *Cadott Educ. Ass'n. v. WERC*, 197 Wis. 2d 46, 49, 540 N.W.2d 21 (Ct. App. 1995). In *Cadott,* a union member was denied holiday pay because he was on medical leave the day before and the day after a holiday. *Id.* at 49–50. The union filed a prohibited practices complaint against the school district for failure to bargain, arguing that the collective bargaining agreement required the district to bargain with the union before denying holiday pay to those who missed work the day before and the day after

a holiday. *Id.* at 50–51. WERC rejected this argument, holding that the holiday pay provision read in conjunction with the rest of the collective bargaining agreement sufficiently defined the union members' holiday pay rights. *Id.* at 56. WERC held that the union's remedy was through the grievance arbitration process. *Id.* This court affirmed, and held that the subject of holiday pay had been bargained over by the parties. *Id.* at 58. The union's remedy was to file a grievance and argue that the school district violated the terms of the collective bargaining agreement. *Id.*

¶ 22. *Cadott* is significant because it held that it was not a prohibited practice for a party to exercise a right that was collectively bargained for. The union in *Cadott* may not have anticipated the scenario of a union member being on medical leave the day before and the day after a holiday and how that would affect holiday pay benefits, but that did not change the fact that the parties already bargained over holiday pay. Likewise, Washington County exercised a right that was collectively bargained for. The Union may not have anticipated that the County would subcontract or perhaps the Union was just careless in its negotiations, but layoffs and subcontracting were nonetheless addressed in the collective bargaining agreement. The Union's only recourse, like that of the union in *Cadott*, was to seek a remedy in the grievance-arbitration process. The fact that an arbitrator denied the Union's grievance after he found that the collective bargaining agreement expressly allowed for subcontracting underscores that the issue of subcontracting was already bargained over. The County was therefore within its rights to subcontract.

## CONCLUSION

¶ 23.   We hold that the County did not act in bad faith when it exercised its clear contractual right to subcontract as the mandatory subjects of layoffs and subcontracting were bargained for by the parties. While the Union may regret that it failed to limit or eliminate language in the collective bargaining agreement that allowed the County to subcontract, the Union still ratified the agreement. As the County was acting within its rights, its conduct does not amount to bad faith. The order of the circuit court is reversed.

*By the Court.*—Order reversed.

¶ 24.   BROWN, C.J. (*concurring*). I just want to make clear what we are holding and what we are not holding. We are holding that because the Union knew that Washington County was considering work force changes in order to cut costs—and specifically knew that the County had earlier issued layoff notices to five Union members (only to rescind them soon thereafter)—the Union was on notice that the County might take advantage of a bargained right to lay off or subcontract as a cost-saving measure. This is especially so when the County warned the affected Union employees that its action in rescinding the layoffs was not "a guarantee of future employment." The yellow flag had been raised and, therefore, the Union had a notice and an opportunity to seek information about the layoff/subcontract clause. Had the Union done so, and had the County been forthcoming, the issue of subcontracting could have been negotiated. Had the County not been forthcoming, then the Union would have had a valid bad faith claim.

¶ 25.   For WERC to reason that the County had to let the Union know it was "seriously considering" invok-

ing the layoff/subcontract clause is contrary to WERC's own prior opinion on the subject. It also, in my view, is an unworkable standard. What would be considered "serious" and what not? Neither employer nor union could glean any guidance for the future.

¶ 26. We are not holding, however, that a union must speak up about a clause even in the absence of a yellow flag. I note that, according to the previous collective bargaining agreements, the Union had to let the County know five months in advance what clauses the Union wanted to put on the table for negotiation. Consistent with WERC's decision in *City of Marshfield*, if a union had *no reason to know* that it should seek certain relevant and necessary information, then we would have a different fact situation entirely.